**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

**WILLIAM EARL LYND,**                    :
                                          :
                    Petitioner,           :
                                          :
VS.                                       :
                                          :        CIVIL ACTION NO.: 7:01-CV-95 (HL)
**WILLIAM TERRY, Warden**,                 :
                                          :
                    Respondent.           :
_____ :

## <u>O R D E R</u>

Petitioner, an inmate on death row at the Georgia Diagnostic and Classification Prison

in Jackson, Georgia, petitions the Court for a writ of habeas corpus pursuant to 28 U.S.C. §

2254.  For the following reasons, the Court denies Petitioner's request for relief.

## I.  BACKGROUND

### A.  Facts

The historical facts concerning this case were set forth as follows by the Supreme Court

of Georgia:

> Lynd and the victim [Virginia "Ginger" Moore] lived together in her home in
> Berrien County.  Following an argument three days before Christmas of 1988,
> Lynd shot the victim in the face and went outside to smoke a cigarette.  The
> victim regained consciousness and followed him outside.  Lynd shot her a second
> time, put her into the trunk of her car and drove away.  Hearing the victim
> "thumping around" in the trunk, Lynd got out, opened the trunk and shot the
> victim a third time, killing her.

1

> Lynd returned home, cleaned up the blood, and drove to Tift County, where he buried the victim in a shallow grave.  He then drove to Ohio.  Lynd shot and killed another woman in Ohio and then sold the gun he used to kill her and the victim in this case.  Eventually, Lynd returned to Georgia to surrender to Berrien County authorities.  The murder weapon was recovered and identified by ballistics examination, and the victim's body was located based on information provided by Lynd.

*Lynd v. State*, 262 Ga. 58 (1992).

## B.  Procedural History

Petitioner was arrested on December 31, 1988.  He filed a special plea of incompetence that was tried before a jury on October 23 through 25, 1989.  (Resp't Exs. 14-16).  The jury found Petitioner competent to stand trial.  (Resp't Ex. 16).  On February 26, 1990, Petitioner was found guilty and convicted of murder, in violation of O.C.G.A. § 16-5-1, and kidnaping with bodily injury, in violation of O.C.G.A. § 16-5-40(b).  On February 27, 1990, Petitioner was sentenced to death for the crime of murder, and given a life sentence for the crime of kidnaping with bodily injury.  *See Lynd v. State*, 262 Ga. 58 (1992).

Petitioner filed a Motion for New Trial that the trial court denied on March 5, 1991.  (Resp't Ex. 30).

Petitioner filed a notice of appeal and his conviction and sentence were affirmed by the Supreme Court of Georgia on February 27, 1992.  *Lynd v. State*, 262 Ga. 58 (1992).  That court denied Petitioner's motion for reconsideration on March 18, 1992 and the Supreme Court of the United States denied certiorari on November 2, 1992.  *Lynd v. Georgia*, 506 U.S. 958 (1992).

Petitioner filed a Petition for Writ of Habeas Corpus in the Superior Court of Butts County, Georgia on December 20, 1995, and filed an amended petition on October 21, 1996.  (Resp't Exs. 49, 52).  Following an evidentiary hearing on May 5, 1997, the habeas court denied

Petitioner's Writ of Habeas Corpus on January 14, 1998.  (Resp't Exs. 55, 59).

On April 17, 1998, Petitioner filed an Application for Certificate of Probable Cause to Appeal with the Supreme Court of Georgia, which the court denied on September 11, 2000. (Resp't Exs. 61-62).  Petitioner filed a Motion for Reconsideration that the Supreme Court of Georgia denied on October 6, 2000.  (Resp't Ex. 64).  The Supreme Court of the United States denied certiorari on June 18, 2001, and denied Petitioner's petition for a rehearing on August 27, 2001.  *Lynd v. Turpin*, 533 U.S. 921 (2001); *Lynd v. Turpin*, 533 U.S. 971 (2001).

On October 5, 2001, Petitioner filed in this Court his Petition for Writ of Habeas Corpus by a Person in State Custody.  (R. at 2).   The Petition contains twenty-three grounds for relief.

On March 31, 2003, Petitioner filed a Motion for Leave to Conduct Discovery and Authorization and Payment of Necessary Expert and Investigative Services.  (R. at 22).  In this motion and accompanying brief, Petitioner requested funds for an expert investigator, a pathologist, a crime scene reconstruction expert, a mental health expert, a media content analyst, and a social psychologist.  (R. at 22, 23).  In an Order dated August 16, 2003, the Court denied Petitioner's motion.  (R. at 25).  Additionally, in an Order dated December 23, 2003, the Court denied Petitioner's Motion for Reconsideration of Denial of Leave to Conduct Discovery and Authorization and Payment of Necessary Expert and Investigative Services.  (R. at 29).

Petitioner filed a Motion for Evidentiary Hearing and Request for Oral Argument on February 25, 2004 and the parties briefed the issues.  (R. at 30).  The Court denied this Motion in an Order dated August 17, 2004.  (R. at 32).

## II. DISCUSSION

### A. Standard of Review

Because Petitioner filed his federal habeas petition after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA "'establishes a highly deferential standard for reviewing state court judgments'." *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005)(quoting *Parker v. Sec'y for Dep't of Corr.*, 331 F.3d 764, 768 (11th Cir. 2003)). Pursuant to AEDPA, when a habeas petitioner's claim has been adjudicated on the merits in the state court proceedings, a federal district court can grant federal habeas relief only if the state court's decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254 (d).

In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court of the United States explained the meaning of the phrase "contrary to" as it is used in § 2254 (d)(1). The Court stated that "[a] state-court decision is contrary to th[e] [Supreme] Court's precedent if the state court arrives at a conclusion opposite to that reached by th[e] Supreme Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]."[1] *Williams,*

---

[1] The phrase "clearly established Federal law, as determined by the Supreme Court of the United States" "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

529 U.S. at 405.  "A state court's decision that applies the law as determined by the Supreme Court to the facts is not 'contrary to' whether or not the federal court would have reached a different result."  *Carr v. Schofield*, 364 F.3d 1246, 1250 (11th Cir. 2004)(quoting *Fugate v. Head*, 261 F.3d 1206, 1216 (11th Cir. 2001), *cert. denied* 535 U.S. 1104 (2002)).  The federal district court cannot substitute its opinion for that of the state court.  Moreover, if there is no Supreme Court precedent on point, "'the court cannot say that the state court's conclusion . . . is contrary to clearly established federal law as determined by the United States.'" *Henderson v. Haley*, 353 F.3d 880, 890 (11th Cir. 2003)(quoting *Isaacs v. Head*, 300 F.3d 1232, 1252 (11th Cir. 2002)).

There are two ways in which a state court decision may be an "unreasonable application of clearly established Federal law."  28 U.S.C. § 2254 (d)(1).  "A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision 'involving an unreasonable application of . . . clearly established Federal law'." *Williams*, 529 U.S. at 407-408 (quoting 28 U.S.C. § 2254 (d)(1)).  Additionally, "[t]he state court's decision is an objectively 'unreasonable application' if it 'identifies the correct governing [Supreme Court] legal principle . . . but . . .'refuses to extend the governing principle to a context in which the principle should have controlled'." *Carr*, 364 F.3d at 1250 (quoting *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000)).  When attempting to determine if the state court's decision involved an unreasonable application

of federal law, the federal district court need not decide if it "would have reached the same result as the state court if [it] had been deciding the issue in the first instance." *Wright v. Secretary for the Dep't of Corr.*, 278 F.3d 1245, 1256 (11th Cir. 2002).  Instead, the court merely "should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams,* 529 U.S. at 409.

In addition to the two narrow "contrary to" and "unreasonable application of" prongs of AEDPA that authorize federal habeas corpus relief, a petitioner is also entitled to relief if the state court's conclusion is based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254 (d)(2).  However, this Court's "review of a state court's judgment . . . is governed by a 'highly deferential standard of review for factual determinations made by a state court'." *Carr*, 364 F.3d at 1250 (quoting *Fugate*, 261 F.3d at 1215).  A state court's factual findings are presumed correct unless rebutted by clear and convincing evidence.  *McNair*, 416 F.3d at 1309 (citing 28 U.S.C. § 2254 e)(1)).  Furthermore, this Court must give deference to the state court's determinations regarding credibility.  *Baldwin v. Johnson*, 152 F.3d 1304, 1317 (11th Cir. 1998).

## B.  Petitioner's Specific Claims

In its Order dated February 17, 2005, the Court found that Petitioner had procedurally defaulted two of his enumerated claims: claims  nine and ten.[2]  As Petitioner's federal habeas

---

[2]In addition to these two procedurally defaulted claims, Respondent claims that several of the claims contained in Petitioner's Brief on the Merits of Claims for Relief have been procedurally

corpus petition contains a total of twenty-three claims, this would presumably leave twenty-one claims to be addressed in this Order.  However, Petitioner has failed to brief sixteen of the claims that are contained in his petition.  Petitioner has completely failed to address claims three, five, seven, eight, eleven, thirteen, fourteen (to the extent this claim is not covered in claim six of his petition), fifteen (to the extent this claim is not covered in claim six of his petition), sixteen, seventeen, eighteen, nineteen, twenty, twenty-one, twenty-two, and twenty-three.

The Court assumes that Petitioner has thoroughly briefed all of the issues that he desires to pursue. Claims not briefed by Petitioner are deemed abandoned and will not be addressed further by the Court.  *See Isaacs v. Head*, 300 F.3d 1232, 1253 n.6 (11th Cir. 2002); *United States v. Ardley*, 242 F.3d 989 (11th Cir. 2001); *Donnelly v. Peters*, 199 F. Supp. 2d 1372, 1373 n.1 (M.D. Ga. 2002).  All of the claims addressed in Petitioner's brief are discuss below:

**1.   Claim One: Petitioner was deprived of his right to the assistance of necessary and competent experts, and the trial court's exclusion from Petitioner's competency trial and both phases of his capital trial of the mental health treatment evidence which he did receive [violated] . . .  the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

There are actually two grounds for relief in the first claim contained in Petitioner's federal habeas corpus petition.  First, Petitioner claims that he was deprived of his right to the assistance of necessary and competent experts in violation of *Ake v. Oklahoma*, 470 U.S. 68 (1985).

---

defaulted.  The Court addresses the issue of procedural default as it applies to these additional claims below.

Specifically, Petitioner states that "the trial court unconditionally forbade the psychiatrist and social worker who evaluated Petitioner (Dr. Fabio Cabrera-Mendez and psychiatric social worker Robert Church) from communicating with defense counsel." (Pet'r Br. on the Merits of Claims for Relief, p. 2). Second, Petitioner states that the trial court violated the Fifth, Sixth, Eight, and Fourteenth Amendments to the United States Constitution by excluding these mental health experts' testimony from his competency trial and both phases of his capital trial. Both of these claims are addressed separately below.[3]

a. Petitioner's allegation that he was deprived of his right to the assistance of necessary and competent experts in violation of *Ake v. Oklahoma*, 470 U.S. 68 (1985).

Respondent states that Petitioner has procedurally defaulted his claim that the trial court denied him adequate funds for competent mental health experts or denied him access to the psychiatrist and social worker who evaluated him. A review of the record shows that Respondent is correct and this *Ake* claim has been procedurally defaulted.

Petitioner never set forth this *Ake* claim on direct appeal to the Supreme Court of Georgia. The only claim that Petitioner made regarding mental health experts was that "[t]he trial court erroneously refused to allow [Petitioner] to present expert testimony at his trial and capital sentencing proceeding." (Resp't Ex. 39, p. 23). Petitioner's only claim was that he should have been allowed to introduce expert testimony from the "independent, defense-hired mental health

_____

[3]Petitioner also alleges that his trial attorney, Clyde Royals, was ineffective in that he allegedly advised Petitioner not to cooperate with a state evaluation and that this advise was unreasonable and not the result of tactical or strategic decision. The Court addresses this claim, along with all of Petitioner's other ineffective assistance of counsel claims, on pages 15 to 33 in this Order.

experts" who examined him.  (Resp't Ex. 39, p. 24).

The Georgia Supreme Court held as follows:

> The trial court did not err by excluding testimony of the defendant's mental health experts where the defendant refused to submit to an examination by mental health experts chosen by the [S]tate. . . .  Such an exclusion is justified "by the States' overwhelming difficulty in responding to the defense psychiatric testimony without its own psychiatric examination of the accused and by the need to prevent fraudulent mental defenses." . . .   A criminal defendant can no more present psychiatric testimony without submitting to an examination by a state-selected psychiatrist than he may testify at trial without submitting to a cross-examination.

*Lynd,* 262 Ga. at 64 (citations omitted).

The Court never referenced *Ake* because Petitioner never cited *Ake* and never claimed that he had been denied expert assistance; only that the trial court erroneously refused to allow testimony from the experts who had assisted him.

It was at the state habeas level that Petitioner first raised his *Ake* claim.  In his First Amended Petition for Writ of Habeas Corpus, Petitioner alleged that "[t]he trial court erred in failing to provide counsel with adequate funds for competent experts to allow counsel to adequately represent Petitioner."  (Resp't Ex. 52, p. 4).  In response to this claim, the state habeas corpus court held as follows:

> This enumeration is procedurally barred under Black v. Hardin, 255 Ga. 239 (1985), the Petitioner not having made the requisite showing of adequate cause for failure to object or pursue on appeal *and* a showing of actual prejudice to the Petitioner.  This Court also finds no substantial denial of constitutional rights which would overcome the procedural bar.

(Resp't Ex. 59, p. 4).

This Court "may not review a claim procedurally defaulted under state law if the last state court to review the claim clearly and expressly states that its judgment rests on a procedural bar and the bar presents an independent and adequate state ground for denying relief." *Hill v. Jones*, 81 F.3d 1015, 1022 (11th Cir. 1996)(citing *Harris v. Reed*, 489 U.S. 255 (1989)).  As the state habeas court "clearly and expressly" held that this claim was procedurally defaulted, this Court cannot review the claim unless Petitioner demonstrates "both cause excusing the default and actual prejudice resulting from the bar" or "a fundamental miscarriage of justice." *Hill*, 81 F.3d at 1022-23.  Petitioner has not made such a showing and, therefore, this Court defers to the state habeas court's ruling that Petitioner's *Ake* claim is procedurally defaulted.

b.  Petitioner's claim that the trial court violated the Fifth, Sixth, Eight, and Fourteenth Amendments to the United States Constitution by excluding the mental health experts' testimony from his competency trial and both phases of his capital trial

Petitioner maintains that the trial court erred by not allowing Petitioner to present the expert testimony of Dr. Fabio Cabrera-Mendez and psychiatric social worker Robert Church. Petitioner states that these defense experts could have provided information that was relevant to Petitioner's state of mind at the time of the crime and relevant to the issue of mitigation of punishment.

The record in this case shows that on four separate occasions, Petitioner refused to be interviewed by the State's psychologist, Mr. Loren Hildebrant.  (Resp't Ex.  7, p. 23, 25, 27; Resp't Ex. 8, p. 3; Resp't Ex. 10, p. 1; Resp't Ex. 12, p. 2-3, 6, 9-11).  Following Petitioner's second refusal to speak to Mr. Hildebrant, Petitioner testified that he would speak to the State's

psychologist if the Court allowed him funds to hire his own mental health expert.  (Resp't Ex. 7, p. 27, 35).  The Court then allowed Petitioner to be examined by his chosen psychiatrist, Dr. Fabio Cabrera-Mendez (along with social worker Robert Church), who found him competent to stand trial. (Resp't Ex. 10, p. 1; Resp't Ex. 12, p. 15-17; Resp't Ex. 29, p. 396-405).   Even after being interviewed by his own mental health experts, Petitioner continued to refuse to speak with Mr. Hildebrant.  Finally, at an October 5, 1989 pretrial hearing, Petitioner testified as follows regarding his refusal to let Mr. Hildebrant interview him:

> Q.  In this affidavit, did you state any reasons why you would not submit to the evaluations of Mr. Hildebrant?
>
> A.  Yes, I learned he lied on me at two different occasions.
>
> . . .
>
> A.  If he's going to lie about that, I don't want anything else I say to him distorted or lied about.
>
> Q.  Mr. Lynd, what did you tell the Court that you would do if you were provided with your own psychiatrist?
>
> A.  That I would agree to an evaluation.
>
> Q.  By whom?
>
> A.  After I was assured that I was evaluated by my own doctor, I would talk to theirs.
>
> Q.  Have you been evaluated by your own doctor?
>
> A.  Yes.
>
> Q.  How do you know he's your doctor?
>
> A.  Well, that's what I understood it to be from the Court, for the defense.
>
> Q.  Well, why haven't you submitted to the evaluation by the State?
>
> A.  Because he's lied on me twice, and I don't want anything else I have said twisted and distorted.

(Resp't Ex. 12, p. 9-11).

Because Petitioner refused to submit to an examination by the State's psychologist, the trial court ruled that Petitioner's psychiatrist would not be allowed to testify on the issue of Petitioner's mental competency.[4]  (Resp't Ex. 12, p. 23).  As explained above, on appeal the Georgia Supreme Court held that "[t]he trial court did not err by excluding testimony of the defendant's mental health experts where the defendant refused to submit to an examination by mental health experts chosen by the [S]tate."  *Lynd*, 262 Ga. at 64.

As the state court adjudicated this claim on the merits, to obtain relief Petitioner must show that the state court's decision was "contrary to, or . . . an unreasonable application of, clearly established" United States Supreme Court precedent, or "based on an unreasonable determination of the facts in light of the evidence."  28 U.S.C. § 2254 (d).  The threshold issue the Court must decide is what constitutes the "clearly established Federal law" on this issue.

Although it is difficult to tell from Petitioner's brief, it appears that he maintains the applicable law is *Ake v. Oklahoma*, 470 U.S. 68 (1985).   The Court in *Ake* held as follows:

> when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the States the decision on how to implement this right.

*Ake*, 470 U.S. at 83.

---

[4]The record shows that the trial court did allow Dr. Cabrera-Mendez and Robert Church's reports to be proffered as an offer of proof for the purpose of perfecting the record.  (Resp't Ex. 28, p. 2351; Resp't Ex. 29, p. 396-405).

As can be seen from this holding, the Court in *Ake* addressed the issue of when a State must provide a defendant with access to a mental health expert (the issue discussed above; which the Court finds has been procedurally defaulted); not the issue of whether a court must admit that expert's testimony when the defendant refuses to submit to an examination by the State's mental health expert.  The Court in *Ake* simply was not faced with this issue.  Therefore, it does not appear that *Ake* provides the "clearly established Federal law" on this issue.

Respondent alleges that the "clearly established Federal law" is contained in *Estelle v. Smith*, 451 U.S. 454 (1981).  28 U.S.C. § 2254 (d) (1).  In *Estelle*, the Supreme Court of the United States held that the admission of a psychiatrist's testimony during the penalty phase of Smith's trial violated his Fifth Amendment right against self-incrimination because Smith was not advised before the pretrial psychiatric examination that he had a right to remain silent and anything he said could be used against him at his capital sentencing hearing.  *Id*. at 466.  The Court distinguished Smith's situation from one in which the defendant asserts an insanity defense and seeks to introduce testimony from a mental health expert to support such assertion. On that issue, the Court stated as follows:

> When a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he has interjected into the case.  Accordingly several Courts of Appeals have held that, under such circumstances, a defendant can be required to submit to a sanity examination conducted by the prosecution's psychiatrist.

*Id*. at 465-66.

13

After reviewing the record, this Court finds that the Georgia Supreme Court's ruling is not "contrary to, . . . or an unreasonable application" of *Estelle* or any other "clearly established" Supreme Court precedent.[5]   This is not a situation in which the state court's conclusion is "opposite to that reached by th[e] Supreme Court on a question of law" or a situation in which the state court was faced with "facts that are materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at a result opposite to [the Supreme Court]."  *Williams*, 529 U.S. at 405.  Furthermore, Petitioner has not shown that the state court's application of any federal law on this issue was objectively unreasonable or that the Georgia Supreme Court's decision on this issue was based on "an unreasonable determination of the facts in light of the evidence."  28 U.S.C. § 2254 (d).  Therefore, the Court denies relief on this claim.

### **2.  Claim Two:  Petitioner was denied his right to the effective assistance of counsel at his capital trial and direct appeal in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Petitioner alleges that he was denied his right to the effective assistance of counsel at his

---

[5]The Court notes that the relevant language in *Estelle* dealing with this particular issue appears to be dicta and, as such, would not provide the "clearly established Federal law" on this issue.  *See Williams v. Taylor*, 529 U.S. 362, 412 (2000)(explaining that § 2254(d)(1)'s "clearly established" phrase "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." )  Assuming *Estelle* does not provide the "clearly established Federal law," there appears to be no Supreme Court precedent on point and this Court's ultimate decision to deny relief on the issue would stand.  *See Henderson v. Haley*, 353 F.3d 880, 890 (11th Cir. 2003)(explaining that if there is no Supreme Court precedent on point, "'the court cannot say that the state court's conclusion . . . is contrary to clearly established Federal law as determined by the United States'") (quoting *Isaacs v. Head*, 300 F.3d 1232, 1252 (11th Cir. 2002)).

trial and on appeal.[6]  "The Supreme Court clearly established the federal law governing ineffective assistance of counsel claims in *Strickland v. Washington*, 466 U.S. 668 (1984)." *Rutherford v. Crosby*, 385 F.3d 1300, 1308 (11th Cir. 2000).  The standard announced in *Strickland* is as follows:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687.

Regarding review of an ineffective assistance of counsel claim under § 2254 (d), the Eleventh Circuit explained as follows:

> In assessing [a Petitioner's] claim that his trial counsel were ineffective we must keep in mind that "judicial scrutiny of counsel's performance must be highly deferential." . . .  In addition to the deference to counsel's performance mandated by *Strickland*, the AEDPA adds another layer of deference–this one to a state court's decision–when we are considering whether to grant federal habeas relief from a state court's decision. . . . [A petitioner] must do more than satisfy the *Strickland* standard.  He must also show that in rejecting his ineffective assistance

---

[6]Petitioner states that he "renews his request for discovery and an evidentiary hearing" so that he might further develop and present his claims of ineffective assistance of counsel to this Court. (Pet'r Br. on the Merits of Claims for Relief, p. 28, n.8). This Court has already entered three Orders dealing with Petitioner's requests for discovery and an evidentiary hearing. In an Order dated August 16, 2003, this Court denied Petitioner's first request for discovery. (R at 25). In an Order dated December 23, 2003, this Court denied Petitioner's motion for reconsideration of its August 16, 2003 Order. (R. at 29). Finally in an Order dated August 17, 2004, this Court denied Petitioner's motion for an evidentiary hearing. (R. at 32). The Court refuses to reconsider any of its decisions on these issues at this time.

of counsel claim the state court "applied *Strickland* to the facts of his case in an objectively unreasonable manner."

*Rutherford*, 385 F.3d at 1309 (citations omitted).

Petitioner claims that his various attorneys were ineffective for the following reasons: (1) One of his attorneys unreasonably advised him not to cooperate with the State's mental health expert; (2) His trial attorneys unreasonably failed to investigate the States case; (3) His trial attorneys failed to conduct a reasonable investigation into Petitioner's life history, mental health, and substance abuse; and (4) One of his attorneys labored under a conflict of interest.[7] The Court addresses each of these ineffective assistance of counsel claims below.[8]

     a.  Petitioner's claim that attorney Clyde Royal's unreasonably advised him that he should refuse to submit to an examination by the State's mental health expert.

As discussed previously, Petitioner, on four separate occasions refused to speak to the State's psychologist (Mr. Loren Hildebrant), and this refusal resulted in the trial court's decision to exclude testimony from Petitioner's own mental health experts.  (Resp't Ex.  7, p. 23, 25, 27; Resp't Ex. 8, p. 3; Resp't Ex. 10, p. 1; Resp't Ex. 12, p. 2-3, 6, 9-11).  Petitioner maintains that he refused to talk to the State's psychologist because one of his trial attorneys, Clyde Royals,

---

[7]In addition to *Strickland*, the  "clearly established Federal law" on the issue of an attorney's conflict of interest is contained in *Cuyler v. Sullivan*, 446 U.S. 335 (1980) and is discussed below.

[8]The Court notes that Petitioner's federal habeas petition contains additional claims of ineffective assistance of counsel.  However, the Court assumes that in his Brief on the Merits of Claims for Relief, Petitioner has addressed all of the claims he wishes to pursue.  As the Court explained earlier, specific claims not briefed by Petitioner are deemed abandoned and will not be discussed further by the Court.  *See Isaacs v. Head*, 300 F.3d 1232, 1253 n.6 (11th Cir. 2002); *United States v. Ardley*, 242 F.3d 989 (11th Cir. 2001); *Donnelly v. Peters*, 1999 F. Supp. 2d 1372, 1373 n.1 (M.D. Ga. 2002).

unreasonably advised him not to speak to the psychologist.  Petitioner states that Mr. Royals advised his not to speak to Mr. Hildebrant "because Royals was 'extremely upset,' and had no strategic basis for telling Petitioner not to agree to the state evaluation."  (Pet'r Br. on the Merits of Claims for Relief, p. 19-20).

The pretrial record shows that on several occasions prior to the trial court's appointment of Petitioner's psychiatrist, Dr. Fabio Cabrera-Mendez, Petitioner refused to speak with the State's psychologist, Mr. Loren Hildebrant.  (Resp't Ex. 7, p. 23, 26; Resp't Ex. 8, p. 3-5).  The court then asked Petitioner's attorneys to provide it with the names of three potential mental health experts.  (Resp't Ex. 8, p. 4-5).  From this list of three, the court chose Dr. Cabrera-Mendez and he, along with a social worker, Robert Church, interviewed Petitioner on several different occasions.  (Resp't Ex. 10, p. 1; Resp't Ex. 12, p. 15-17).  Even after being interviewed by his own mental health experts, Petitioner continued to refuse to speak with Mr. Hildebrant.

In an October 5, 1989 pretrial hearing, Petitioner stated that he would not speak with the States's expert because, Mr. Hildebrant "lied on [him] at two different occasions" and Petitioner did not "want anything else [he had to say] twisted and distorted."  (Resp't Ex. 12, p. 9).  Petitioner never stated that any of his attorneys advised him not to speak with Mr. Hildebrant.  Petitioner's attorney, Clyde Royals, testified at this same hearing.  Mr. Royals testified that he was "present on the third occasion that Mr. Hildebrant came to evaluate Mr. Lynd."  (Resp't Ex. 12, p. 22).  During his testimony at the October 5, 1989 hearing, Mr. Royals gave no indication that he told Petitioner not to speak with Mr. Hildebrant.  (Resp't Ex. 12, p. 22).  It was at this

17

same October 5, 1989 hearing that the trial court ruled that the testimony of Dr. Cabrera-Mendez would not be admissible because Petitioner refused to be interviewed by the State's expert. (Resp't Ex. 12, p. 23).

Years later, during the state habeas court's evidentiary hearing, Mr. Royals stated for the first time that it was he who told Petitioner not to speak with Mr. Hildebrant. Mr. Royals explained that Petitioner and Mr. Hildebrant "didn't get along from the beginning, and [Petitioner] would refuse to be evaluated by Hildebrant." (Resp't Ex. 55, p. 51). Regarding Mr. Hildebrant's attempts to interview Petitioner after Petitioner was examined by Dr. Cabrera-Mendez, Mr. Royal's explained that "I told him that we still didn't have our own psychologist and until we got one there was no sense in giving them the evaluation." (Resp't Ex. 55, p. 58-59).

The state habeas court ruled on this issue and held that "it was the Petitioner's refusal to be examined by the State's mental health professionals that lead [sic] to the exclusion of any mental health evidence regarding Petitioner's mental state and culpability. Petitioner has not made the requisite showing that trial counsel's performance was inadequate." (Resp't Ex. 59, p. 9). As this issue was adjudicated on the merits in the state habeas court, § 2254 (d) applies.[9]

---

[9]Petitioner states that the state habeas court declined to admit the affidavits of Dr. Cabrera-Mendez and Robert Church offered by Petitioner in support of his claims of ineffective assistance of trial counsel. Therefore, according to Petitioner, the state habeas court's decision on this issue does not represent an adjudication on the merits and this Court should conduct a *de novo* review of this issue. However, the state habeas court clearly rejected this claim on the merits when it found that it was Petitioner, not his attorney, who caused the exclusion of the experts' mental health evidence. (Resp't Ex. 59, p. 9).

As explained above, the "clearly established the Federal law" governing ineffective assistance of counsel claims is contained in *Strickland* and the state habeas court cited and applied *Strickland* to the facts in this case. Therefore, the state habeas court's decision is not "contrary to . . . clearly established Federal law." 28 U.S.C. § 2254 (d)(1); *Crawford v. Head*, 311 F.3d 1288, 1313 (2002)(explaining that when the state habeas court identifies "the correct legal standard under the Supreme Court's precedent" the district court's review is "limited to whether the state court unreasonably applied controlling Supreme Court precedent to the facts of this case.")

Petitioner has not shown that the state habeas court's decision involved an unreasonable application of *Strickland* or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254 (d)(2). The evidence certainly justified the state habeas court's factual finding that it was Petitioner, not his counsel, who made the decision not to talk to the State's mental health expert. Petitioner clearly testified that he decided not to speak with the State's psychologist because he thought Mr. Hildebrant was a liar. (Resp't Ex. 12 p. 10-11). All factual findings made by the state court are presumed accurate unless "rebutted by clear and convincing evidence." *McNair*, 416 F.3d at 1309. Petitioner has not provided any such "clear and convincing" evidence that the state court's factual findings on this issue were incorrect. Therefore, the Court denies relief on this claim.

     b.  Petitioner's claim that his trial counsel failed to conduct a reasonable investigation into the State's case

Petitioner claims that his trial attorneys failed to investigate the State's case. Specifically, Petitioner maintains that the victim's death was "virtually instantaneous" after he shot her the second time in the head behind her left ear and she "experienced no suffering or torture." (Pet'r Br. on the Merits of Claims for Relief, p. 30). Petitioner alleges that because the victim died immediately, "she was not kidnaped after being shot, and her murder did not occur while [Petitioner] was engaged in kidnaping her." (Pet'r Br. on the Merits of Claims for Relief, p. 30).

Petitioner alleges that the State's case to the contrary was based on "false and misleading 'expert' testimony from medical examiner Warren Tillman . . . and, additionally, on an unreliable confession from Mr. Lynd which was the product of improper and coercive police interrogation tactics." (Pet'r Br. on the Merits of Claims for Relief, p. 29-30). Petitioner maintains that his trial attorneys were ineffective in that they unreasonably relied on his confession and "never sought funds from the trial court to retain a pathologist to confront" Warren Tillman's testimony. (Pet'r Br. on the Merits of Claims for Relief, p. 33). Finally, without elaboration, Petitioner maintains that his "counsel failed to conduct an adequate investigation into the similar transactions and bad character evidence offered by the State, and an adequate investigation would have resulted in the exclusion of that evidence." (Pet'r Br. on the Merits of Claims for Relief, p. 33).

Looking first a the record from Petitioner's trial, it appears that Petitioner's trial attorneys

presented the same theory of this case that his federal habeas corpus attorneys are now presenting; i.e., Petitioner is innocent of the kidnaping of Ms. Moore, as well as the statutory aggravating circumstance that the murder occurred while Petitioner was engaged in another capital felony–kidnaping with bodily injury. Petitioner's attorneys have maintained throughout the litigation that Ms. Moore never regained consciousness after the second shot to the left side of her head. However, the jury ruled against Petitioner on this issue and found that "[t]he offense of murder was committed while the offender was engaged in the commission of another capital felony; to wit: kidnaping with bodily injury." *Lynd*, 262 Ga. at 59. The issue was preserved and, on appeal, the Georgia Supreme Court found as follows:

> [Petitioner] argues that he did not commit the offense of kidnaping with bodily injury because the victim was unconscious after the second shot. However, even if we were to accept the untenable assumption the victim could not have been taken "against her will," see O.C.G.A. § 16-5-40 (a) (defining kidnaping), if she were unconscious the entire time . . . , "the evidence is persuasive that [the victim] regained consciousness and vigorously protested her confinement in the trunk of her car before [Petitioner] shot her a third time."

*Lynd,* 262 Ga. at 60.

In relation to Petitioner's confession, the record shows that Petitioner's trial attorneys vigorously challenged the voluntariness and content of this confession with a motion to suppress and presented testimony at a two day *Jackson–Denno* hearing.[10] At this hearing, both Petitioner

---

[10]Petitioner confessed that while standing in the bedroom of the house he and Ms. Moore shared, he shot Ms. Moore in her cheek. He stated that afterwards, he went to the porch of the house to smoke a cigarette. According to Petitioner, Ms. Moore came up behind him and grabbed him. He stated that he never stood, but just pointed the gun behind him and shot her again. Petitioner confessed that Ms. Moore fell to the porch and he loaded her into the trunk of her car. He maintained that he drove around for a while and then pulled off the road to decide what to do next. According to Petitioner, after pulling

and his brother (Gregory Thomas Lynd) testified for Petitioner and Petitioner's trial attorneys cross examined the three witnesses called by the State. (Resp't Ex. 8, 9). The trial court ultimately denied Petitioner's motion to suppress. During the trial, Petitioner's attorneys renewed the motion to suppress the confession and cross examined Sheriff Jerry Brogdon regarding the content and validity of Petitioner's confession. (Resp't Ex. 26, p. 1540, 1577-80).

In relation to the trial testimony of Medical Examiner Warren Tillman, the record shows that Mr. Tillman testified that it was possible Ms. Moore regained consciousness after Petitioner shot her behind her left ear as she stood on her porch. (Resp. Ex. 26, p. 1626-28). This testimony was certainly consistent with the confession given by Petitioner, in which he stated that she did, in fact, regain consciousness prior to him shooting her a third time as she lay in the trunk of her car. (Resp. Ex. 26, p. 1532-34). However, on cross examination, Petitioner's attorney did get Mr. Tillman to testify that a majority of victims would not regain consciousness after receiving the second shot that entered behind her left ear. Moreover, Mr. Tillman stated that it was entirely possible that Ms. Moore did not regain consciousness after Petitioner shot her behind her left ear while she was standing on the porch of her home. (Resp't Ex. 26, p. 1633). He testified on cross examination that there was nothing in his autopsy report "that indicates Ginger Moore regained consciousness after the second shot." (Resp't Ex. 26, p. 1635-36). Therefore, Petitioner's attorneys established through Mr. Tillman exactly what Petitioner

---

over, "he heard her thumping around in the car." (Resp. Ex. 26, p. 1534). He stated "'I'm tired of that Goddamn bitch thumping around in the car'." (Resp. Ex. 26, p. 1534). Petitioner confessed that he exited the car, opened the trunk, and shot her a third time. (Resp. Ex. 26, p. 1532-34).

now complain they failed to show: That it is "entirely possible" Ms. Moore never regained

consciousness and "she may never have felt any more pain after the second shot" to her head.[11]

(Resp't Ex. 26, p. 1633).

Finally, in relation to Petitioner's unsupported allegation that his "counsel failed to

conduct an adequate investigation into the similar transactions and bad character evidence

offered by the State," the record shows that Petitioner's trial attorneys were aware of the similar

transactions and filed a Motion in Limine seeking to have the same excluded. (Pet'r Br. on the

Merits of Claims for Relief, p. 33). However, the trial court ruled against Petitioner and, on

appeal, the Georgia Supreme Court held that the similar transactions evidence was properly

admitted. *Lynd*, 262 Ga. at 65.[12]

The state habeas court ruled on the issue of whether Petitioner's trial counsel conducted

a reasonable investigation into the State's Case. That court held as follows:

---

[11]The Court notes that even if the defense had hired an independent pathologist and that expert convinced the jury that, notwithstanding Petitioner's confession to the contrary, Ms. Moore was killed instantly and, therefore, the murder did not take place during a kidnaping, the jury was nevertheless still authorized to consider the death penalty as they found another aggravating circumstance supported by the evidence; i.e., that the murder was committed during the commission of an aggravated battery. *Lynd*, 262 Ga. at 60.

[12]Although Petitioner states, without explanation, that further investigation would have resulted in the exclusion of the similar transaction and bad character evidence, Petitioner completely fails to explain why this would be the case. Petitioner does not show what this additional investigation would have yielded and why the additional investigation would have resulted in the exclusion of the evidence. *See Hardwick v. Crosby*, 320 F.3d 1127, 1162 n.146 (11th Cir. 2003)(explaining that "[t]o the extent that [a petitioner] contends that [his counsel] should have conducted more investigation for presentation at trial, we have determined that 'speculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation'.")(citations omitted).

Petitioner's attorneys asked for and received monies to hire an investigator, who subsequently performed an investigation and testified at trial.  Furthermore, the Georgia Supreme Court ruled on the admissibility of the similar transactions and bad character evidence and found adversely to Petitioner.  Petitioner has not made a the requisite showing that trial counsel's performance was deficient.

(Resp't Ex. 59, p. 5).

As the state habeas court applied the correct legal rule; i.e., *Strickland*, to the facts of this case, that court's decision is not "contrary to . . . clearly established Federal law."  28 U.S.C. § 2254 (d)(1).  *See Fugate*, 261 F.3d at 1216 (explaining that "a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law")(quoting *Williams*, 529 U.S. at 406).  Moreover, in light of the evidence, discussed at length above, and the deference this Court must give to the state court's decision and to counsel's judgment, the Court cannot say that the state habeas court unreasonably applied *Strickland* to the facts of Petitioner's case.  As such, the Court defers to the finding of the state habeas court and denies relief on this claim.

c.  Petitioner's claim that his trial counsel failed to conduct a reasonable investigation into his life history and resulting mental health and substance abuse problems

First, Petitioner states that the failure of his attorneys to discover and present expert mental health evidence during trial violated his Sixth Amendment right to effective assistance of counsel.  Petitioner also maintains "there was compelling and readily available evidence relating to [his] upbring[ing] and resulting mental health and substance abuse problems that

would have supported the defense theories at both the guilt and penalty phases of the trial . . . [and] [c]ounsel's failure to conduct" an investigation into this evidence and present the same at trial was objectively unreasonable.  (Pet'r Br. on the Merits of Claims for Relief, p. 44-45).

Looking first at the allegation that his attorneys were ineffective for failing to discover and present expert mental health evidence, the record shows that Petitioner's trial attorneys repeatedly requested the assistance of a mental health expert.  Petitioner even concedes as much in his brief when he states that his trial counsel made "repeated requests for expert assistance with regard to defenses at all stages of trial."  (Pet'r Br. on the Merits of Claims for Relief, p. 12.)  Specifically, the record shows that on June 19, 1989, Petitioner's attorneys filed an "Ex Parte Motion to Provide Funds for Expert Assistance," in which they requested funds for a mental health expert.  (Resp't Ex. 31, p. 305-308).  At two subsequent hearings, Petitioner's attorneys again explained that they wanted Petitioner to be examined by their own mental health expert.  (Resp't Ex. 7, p. 29-35; Resp't Ex. 8, p 3-5).  The trial court appointed Dr. Cabrera-Mendez and he interviewed Petitioner on several occasions.  (Resp't Ex. 10, p. 1).  Petitioner's trial counsel even attended  a portion of one of these mental health examinations.  (Resp't Ex. 12, p. 21-23; Resp't Ex. 55, p. 101).

Dr. Cabrera-Mendez and his affiliated social worker, Robert Church, prepared reports detailing Petitioner's mental health issues, substance abuse problems, and social history.  These reports showed that Petitioner started "using marijuana as a teenager and that he and Ms. Moore also abused valium, crack, cocaine, and dilaudids."  (Resp't Ex. 29, p. 397).  The reports also

explained a family history of alcohol abuse by Petitioner's father; that Petitioner suffered from paranoid ideation and "Antisocial Personality Disorder;" and had a full scale IQ of 88. (Resp't Ex. 29, p. 396-405).  The social history shown on the psychiatrist's report detailed Petitioner's academic and social problems in elementary school and showed that he was molested at age eight.  (Resp't Ex. 29, p. 403).  Although Petitioner's attorneys requested the jury have access to the reports, the trial court denied the request and held that the reports could "not go out with the jury but [were placed in the record] for the purpose of perfecting the record." (Resp't Ex. 28, p. 2351).  In short, the record shows that Petitioner's trial attorneys vigorously sought to have their own mental health experts and to have the testimony and reports of these experts presented to the jury during the trial.  However, the trial court excluded this evidence because Petitioner refused to be interviewed by the State's psychologist and the Georgia Supreme Court upheld this ruling.  *Lynd*, 262 Ga. at 64.

In addition to their efforts to discover and present the testimony and reports of the mental health professionals, the record shows that Petitioner's attorneys contacted and called numerous lay witnesses on Petitioner's behalf.  Specifically, Petitioner's trial attorneys called sixteen witnesses during the guilt/innocence phase of his trial.  These witness established that Petitioner had never been violent toward Ms. Moore (although she had a tendency toward violence) and that Petitioner had consumed a large quantity of drugs and alcohol the night before he murdered Ms. Moore.  (Resp't Ex. 27, p. 1944-48, 1954, 1964-66, 1971-80, 1997-98, 2002, 2015).  During the sentencing phase of the trial, Petitioner's attorneys called four additional witnesses and

recalled Petitioner's brother and one of Petitioner's acquaintances.  (Resp't Ex. 28, p. 2292-
2343).  Again, these witnesses testified that Petitioner was not violent toward Ms. Moore, was
a helpful and kind person, and that Petitioner had engaged in heavy drug use and consumed
liquor prior to the murder.  (Resp't Ex 28, p. 2320-26).  Petitioner's attorneys even had the
victim's stepfather testify that Petitioner was "a pretty good guy" and that the stepfather would
not oppose a "life and one day" sentence as long as Petitioner was not released.  (Resp't Ex. 28,
p. 2328-29).

    At the state habeas court evidentiary hearing, one of Petitioner's trial attorney, Clyde
Wayne Royals, testified that prior to the trial, he met with Petitioner every week for almost
fourteen months.  (Resp't Ex. 55, p. 70).  During these visits, Petitioner gave him the names of
prospective witnesses and he contacted these witnesses.  (Resp't Ex. 55, p. 80).  Mr. Royals also
attempted to contact witnesses shown on the State's witness list.   (Resp't Ex 55, p. 80).
However, quite a few of these witnesses were from out-of-state and many of the local witnesses
refused to speak with Petitioner's attorneys.  (Resp't Ex. 55, p. 80-81).  Mr. Royals also testified
that he hired a private investigator to speak with potential witnesses.  (Resp't Ex. 55, p. 83-84).
Additionally, in an attempt to get background and mitigating evidence, Mr. Royals sent letters
to schools, hospitals, the military, and other institutions with whom Petitioner had contact.
(Resp't Ex. 55, p. 85).  Mr. Royals stated that he received Petitioner's school and military
records and spoke with one of his former attorneys.  (Resp't Ex. 55, p. 85-86).  Mr. Royals tried
to get money to have these out-of-state witnesses come and testify, but he was denied such

funds.  (Resp't Ex. 55, p. 86).  Without money for out-of-state witnesses, the attorney stated that

he was able to get Petitioner's mother, father, brother, daughter, and son to attend the trial; and

Petitioner's brother, daughter, and son testified at trial.  (Resp't Ex. 55, p. 87).

Following the evidentiary hearing, the state habeas court applied *Strickland* and

concluded that Petitioner had not established that his attorneys' performance in investigating

Petitioner's life history was deficient.  The court held as follows:

> Royals testified at the evidentiary hearing that he "had a pretty extensive file from
> [Petitioner's] military record, school records, things like then, [he]'d talked to
> quite a few people that had known [Petitioner] previously." . . . .  Royals talked
> to people who knew Petitioner in an effort to obtain mitigating evidence, and in
> fact brought some members of Petitioner's family to trial where they testified on
> his behalf. . . .  At the evidentiary hearing, the Petitioner did not provide any
> evidence of other mitigating factors that trial counsel should have uncovered in
> what was apparently an extensive pre-trial investigation.  Furthermore, it was the
> Petitioner's refusal to be examined by the State's mental health professionals that
> lead [sic] to the exclusion of any mental health evidence regarding Petitioner's
> mental state and culpability. . . .  Petitioner has not made the requisite showing
> that trial counsel's performance was deficient.

(Resp't Ex. 59, p. 9) (citations omitted).

The state habeas court identified the correct legal standard–*Strickland*.  Therefore, the

only question for this Court is whether the state court unreasonably applied *Strickland* to the

facts of the case.  *Crawford*, 311 F.3d at 1313.  Given the facts shown in the record, and recited

above, the Court finds that "the state habeas court was objectively reasonable in its *Strickland*

inquiry." *Putman*, 268 F.3d at 1244 n.1.  This is not a situation in which there was a complete

failure to inquire into Petitioner's past or life history.  *Fugate*, 261 F.3d at1217 (explaining that

"there is no absolute duty to investigate particular facts or a certain life of defense, although a

complete failure to investigate may constitute deficient performance of counsel in certain circumstances."); *Housel v. Head*, 238 F.3d 1289, 1294 (11ᵗʰ Cir. 2001)(holding that "[a] failure to investigate can be deficient performance in a capital case when counsel totally fails to inquire into defendant's past or present behavior or life history.")  Instead, the state habeas court found that Petitioner's counsel conducted an "extensive pre-trial investigation."  (Resp't Ex. 59, p. 9).  The state court's factual finding and ultimate decision on this issue are entitled to deference and must be given "'the benefit of the doubt'."  *Rutherford*, 385 F.3d at 1307 (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).  After reviewing the record and applying this deference, the Court determines that it must deny relief on this claim.

### d.  Petitioner's claim that he was denied conflict-free counsel.

Petitioner alleges that one of his pretrial and trial attorneys, Jack Carter, "labored under a conflict of interest caused by his prior representation of the victim and her family and failed to inform the court or [Petitioner] of the conflict."[13]  (Pet'r Br. on the Merits of Claims for Relief, p. 26-27).  Petitioner states that although he never consented to Mr. Carter's conflict, the trial court waived the conflict and compelled him to accept Mr. Carter as lead counsel. According to Petitioner, Mr. Carter's failure to obtain his consent to the conflict violated both the ethical principles governing attorneys in Georgia and his Sixth Amendment right to conflict-free counsel.

---

[13]Contrary to Petitioner's assertion, Mr. Carter notified the trial court and Petitioner, on the record, that he previously represented the victim's ex-husband and possibly the victim in a bankruptcy. (Resp't Ex. 6, p. 17-21.)

29

The record merely shows that years prior to his representation of Petitioner, Mr. Carter represented the victim and her ex-husband in a bankruptcy proceeding.  (Resp't Ex. 6, p. 17-21). The attorney did not even remember the victim and he was not representing the victim, or her ex-husband, at the time he was appointed to represent Petitioner.  (Resp't Ex. 6, p. 17-21).

The Georgia Supreme Court denied this claim on the merits.  That court held as follows:

> Lynd also argues that the attorney appointed by the court was laboring under a conflict of interest.  Years previously, the appointed attorney had represented the victim's ex-husband in "a bankruptcy or something."  The attorney testified that he likely had represented the victim also, but he could not remember her.  The victim's [ex-]husband presently resides in Melbourne, Florida, according to the record, and did not testify in the case.  The appointed attorney stated to the court that he was merely bringing the matter to the court's attention.  Neither he nor the retained attorney suggested to the court how there was either an actual or serious potential for a conflict.

*Lynd*, 262 Ga. at 63.

As the state court decided this issue on the merits, the only issue for this Court is whether the state court decision is "contrary to, or involved an unreasonable application of, clearly established Federal law," or is based on an "unreasonable determination of the facts in light of the evidence presented."  28 U.S.C. § 2254 (d).

The  "clearly established Federal law" on the issue of an attorney's conflict of interest is contained in *Cuyler v. Sullivan*, 446 U.S. 335 (1980); which both Petitioner and Respondent cite as authority.  In that case, the Court held that "the possibility of conflict is insufficient to impugn a criminal conviction."  *Id*. at 350.  To show a violation of the Sixth Amendment, "a defendant must establish that an actual conflict of interest adversely affected his lawyers performance."

*Id*. Furthermore,

> a defendant who shows that a conflict of interest actually affected the
> adequacy of his representation need not demonstrate prejudice in order to
> obtain relief. . . .  But until a defendant shows that his counsel actively
> represented conflicting interests, he has not established the constitutional
> predicate for his claim of ineffective assistance.

*Id*. at 349-50 (citations omitted).

The Georgia Supreme Court did not cite *Cuyler* to support its decision.[14]  However, the
lack of citation to this authority is not controlling because a state court's opinion is not "contrary
to" established federal law simply because the state court does not cite the Supreme Court
opinion.  In *Early v. Packer*, 537 U.S. 3 (2002), the Court explained as follows:

> A state-court decision is "contrary to" our clearly established precedents if it
> "applies a rule that contradicts the governing law set forth in our cases" or if it
> "confronts a set of facts that are materially indistinguishable from a decision of
> this Court and nevertheless arrives at a result different from our precedent." . . .
> . Avoiding these pitfalls does not require citation to our cases–indeed, it does not
> even require awareness of our cases, so long as neither the reasoning nor the result
> of the state-court decision contradicts them.

*Id*. at 8 (quoting *Williams*, 529 U.S. at 405-406).

In this case, neither the "reasoning or the result" of the Georgia Supreme Court's decision on
this issue contradicts *Cuyler*.  *Early*, 537 U.S. at 8.   As such, the Georgia Supreme Court's
decision was not "contrary to" *Cuyler*.

Additionally, Petitioner has not shown that the Georgia Supreme's Court's decision

---

[14]The Court notes that the Georgia Supreme Court did cite *Mitchell v. State*, 261 Ga. 347 (1991),
which expressly cited and applied *Cuyler*.

31

involved an unreasonable application of *Cuyler* or was "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. §2254 (d). Petitioner made absolutely no showing that Mr. Carter "actively represented conflicting interests." *Cuyler,* 446 U.S. at 350. Moreover, Petitioner has not presented to this Court "clear and convincing evidence" to rebut the state court's factual findings on the issue of Mr. Carter's alleged conflict of interest. 28 U.S.C. 2254 (e). Given this, the Court defers to the state court's decision and denies relief on this claim.

### 3. Claim Four: The trial court's refusal to allow Petitioner to retain and be represented by counsel of his own choosing, and the trial court's continual interference with counsels' division of responsibility, violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

In Claim Four, Petitioner alleges that the trial court violated his constitutional rights by refusing to allow him to retain and be represented by counsel of his own choosing. Furthermore, Petitioner contends that the trial court's constant interference with the attorneys' division of responsibility violated his constitutional rights.

The Georgia Supreme Court exhaustively examined these claims and held as follows:

> Initially, an attorney was appointed for [Petitioner]. Soon thereafter, [Petitioner] retained an attorney to represent him. At a hearing on March 24, 1989, the trial court questioned the two attorneys about their experience and qualifications. The retained attorney testified that he had graduated from law school in 1986 and had been admitted to the Georgia bar in September of 1987. He had maintained a law office and a full-time practice in the year and a-half since being admitted to the bar. He testified that although he had handled "probably" 25 criminal cases, he had actually tried only one felony case before a jury. This was his first death-penalty case.

The appointed attorney had been admitted to the bar for a little longer than six months and had not tried any cases before a jury.

After questioning these two attorneys, the trial court told [Petitioner] it was troubled by his attorneys' lack of experience.  As a consequence, notwithstanding that [Petitioner] had expressed his satisfaction with his two attorneys, the court was going to require [Petitioner] either to retain a more experienced attorney (in addition to or in lieu of his present retained attorney) or -- if he could not afford to do that -- to accept the appointment of a more experienced attorney to act as lead counsel in the case.

At the next hearing, on May 19, 1989, the court announced for the record that [Petitioner's] original appointed attorney had been "relieved of any further responsibility in this case" and that another, more experienced attorney had been appointed by the court to represent the defendant and to act as lead counsel.  Although he had been satisfied with his previous court-appointed attorney, [Petitioner] now objected to the appointment of a "government-paid" attorney to represent him.  According to his retained attorney, [Petitioner] had been in "trouble in a lot of states, had a lot of trouble with the government, and he just does not trust a court-appointed attorney."

Late in July, [Petitioner] told the court he was financially "capable now of hiring my own attorney," and asked the court to relieve his appointed attorney.  However, when the court asked [Petitioner] whom he intended to retain, [Petitioner] stated he had only become "aware" of his new resources the previous evening and had not yet contacted any attorneys.  The court declined to relieve [Petitioner's] appointed attorney at that time, stating [Petitioner] could not "just take lawyers on and off" and "drag" the case on for years.  Later . . . , when [Petitioner] again claimed he could retain an additional attorney,  the court ruled that the appointed attorney

> is going to stay on the team until such time as I see who this attorney is. And if such attorney that's employed is [sufficiently capable and experienced] . . . then at such time, I will remove [the appointed attorney].

[Petitioner], however, never retained any additional attorneys, and was represented at trial by the appointed attorney as lead counsel and by his retained attorney as associate counsel.

(a) [Petitioner] contends he was denied his 6th Amendment right to retain and be represented by the attorney of his own choosing.  A criminal defendant who is financially able to retain the services of an attorney has a constitutional right under the Sixth Amendment to "secure counsel of his own choice."  . . . .

However, "[t]his does not mean that a defendant may retain any counsel at any time he wishes; there are limits to a defendant's right to counsel of choice." . . . . A defendant's right to counsel may not "be insisted upon in a manner that will obstruct an orderly procedure in courts of justice, and deprive such courts of the exercise of their inherent powers to control the same." . . . . Moreover,

> while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers *[Wheat v United States, 486 U.S. (1988)].*

A trial court therefore has the responsibility to

> balance a defendant's constitutional right to retain counsel of his choice against the need to maintain the highest standards of professional responsibility, the public's confidence in the integrity of the judicial process and the orderly administration of justice. . .

The trial court in this case fulfilled this responsibility. While the defendant's retained attorney was not presumptively incompetent to represent a defendant in a death-penalty jury trial, *see United States v. Cronic*, 466 U.S. 648 (1984), his inexperience was justifiably a matter of concern in a case sufficiently more complicated than the run-of-the-mill criminal trial to give pause even to far more experienced attorneys. Claims of ineffectiveness are routine in death-penalty cases, and not the less so in cases in which trial counsel was retained rather than appointed. . . . Given the serious potential for a post-trial claim of ineffectiveness resulting from retained counsel's almost total lack of criminal trial experience, the trial court acted within its discretion to require the defendant either to retain a more experienced attorney or accept the appointment of one.

(b) [Petitioner] argues that he was not "allowed" to retain an additional attorney "although he was willing to go that far." We disagree. Although [Petitioner] stated to the court that he was willing and able to retain an additional attorney, he never did so. The trial court did not err by insisting that the appointed attorney remain on the case until such time as [Petitioner] retained an additional attorney and presented him to the court.

. . . .

(d) Finally, [Petitioner] argues that the court's appointment interfered with retained counsel's independent decisions about how to conduct the defense. Of course, it is to be expected that the appointment of a lead counsel would diminish to some extent the right of retained counsel to make "independent" decisions

34

about how to conduct the defense. But all [Petitioner] can demonstrate is that the trial court refused to allow his retained attorney "to object anytime I want to." A trial court acts well within its discretion when it requires that only one of two or more co-counsel conduct the examination of each witness, including interposing objections during the opposing party's examination of the witness.

*Lynd,* 262 Ga. at 61-64.

In his brief, Petitioner completely ignores the Georgia Supreme Court's lengthy opinion on these issues. Instead, Petitioner states there is no state court opinion on the merits to which this Court should defer because "[t]he habeas court erroneously imposed a res judicata bar to th[ese] claim[s], without consideration of the 'new facts' presented by trial counsel and two mental health experts at the evidentiary hearing, and without consideration of the 'new law' developed in [Petitioner's] post-hearing brief." (Pet'r Br. on the Merits of Claims for Relief, p. 46). A review of the record in this case shows that the state habeas court deferred to the ruling of the Georgia Supreme Court on these issues and held that "[i]t is not the function of the habeas court to review issues already decided on appeal. . . . [These issues were] already decided by the Georgia Supreme Court in *Lynd v. State*, 262 Ga. 58, 61, Div. 9 (1992)." (Resp't Ex. 59, p. 12-13, 26-27).

Although Petitioner asserts there were "new facts" that the state habeas court should have considered, Petitioner has completely failed to tell this Court what these relevant "new facts" are. The facts surrounding Petitioner's appointment of counsel were developed at the pre-trial and trial level and were reviewed by the Georgia Supreme Court on direct appeal.

Likewise, Petitioner has not told the Court what "new law" should have been considered

by the state habeas court.  A comparison of Petitioner's brief presented to the Georgia Supreme Court on direct appeal with that presented to the state habeas court reveals citations to the same law at both levels.  (Resp't Ex. 39, 56).  In short, contrary to Petitioner's unexplained assertions, there appears to be no "new facts" or "new law" that came to light after the Georgia Supreme Court addressed this issue at length in its opinion; and it is that opinion to which this Court must now defer under 28 U.S.C. § 2254 (d).

As the issues Petitioner raises in Claim Four of his federal habeas petition were decided by the Georgia Supreme Court on the merits, the only question for this Court is whether the state court's decision was "contrary to, or . . . an unreasonable application of, clearly established" United States Supreme Court precedent, or "based on an unreasonable determination of the facts in light of the evidence."  28 U.S.C. § 2254 (d).  Petitioner does cite applicable Supreme Court precedent on the issues of right to counsel; such as *Strickland v. Washington*, 466 U.S. 668 (1984), *Powell v. Alabama*, 287 U.S. 45 (1932), and *United States v. Cronic*, 466 U.S. 684 (1984).  However, Petitioner fails to explain how the Georgia Supreme Court's decision was contrary to, or an unreasonable application of, any of these Supreme Court cases.  In fact, the state court expressly relied on relevant Supreme Court authority as contained in *Wheat v. United States*, 486 U.S. 153 (1988) and *United States v. Cronic*, 466 U.S. 648 (1984).  Moreover, this Court does not find that the state court's opinion on this issue was contrary to, or an unreasonable application of, existing Supreme Court precedent.

Furthermore, Petitioner has presented no  "clear and convincing evidence" to rebut the

36

extensive factual determinations made by the Georgia Supreme Court.  As such, this Court defers to the decision of the state court and denies relief on this claim.

### 4.  Claim Six: The trial court's instructions to the jury in the guilt/innocence phase of Petitioner's trial violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Petitioner alleges that the trial court's instructions to the jury in the guilt/innocence phase of his trial violated his constitutional rights.  Specifically, Petitioner states that the trial court's instructions regarding (1) the burden of proof, (2) voluntary manslaughter, and (3) the victim's reputation for violence violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  The Court addresses each of these allegations separately.

#### a.  Petitioner's claim that the trial court's charge on the burden of proof was constitutionally defective

The trial court gave the following lengthy charge on the burden of proof:

> Now, I charge you than this defendant is presumed to be innocent until proven guilty.  He enters upon the trial of this case with a presumption of innocence in his favor.  This presumption surrounds him and protects him until it is overcome by the State with evidence which is sufficient to convince you beyond a reasonable doubt as to the guilt of the accused.  No person shall be convicted of any crime unless and until each element of the crime is proven beyond a reasonable doubt and to a moral and reasonable certainty.
>
> Now, the object of all legal investigation is the discovery of the truth, and the burden of proof rests upon the State to prove every material allegation of the indictment and every essential element of the crime charged beyond a reasonable doubt.  There is no burden of proof upon this defendant whatsoever and the burden never shifts to the defendant to prove his innocence.  However, the State

is not required to prove the guilt of the accused beyond all doubt or to a mathematical certainty. Moral and reasonable certainty is all that can be expected in a legal investigation. Now, reasonable doubt means just what it says. It is a doubt of a fair-minded, impartial juror honestly seeking the truth. It is a doubt based upon common sense and reason. It does not mean a vague or arbitrary notion, but is a doubt for which a reason can be given arising from a consideration of the evidence, the lack of evidence, a conflict in the evidence, or a combination of these. If, after giving consideration to all the facts and circumstances of this case, your minds are wavering, unsettled, unsatisfied, then that is a doubt of the law and you should acquit the defendant. But, if that doubt does not exist in your minds as to the guilt of the accused, then you would be authorized to convict the defendant. If the State fails to prove the defendant's guilt beyond a reasonable doubt, it would be your duty to acquit the defendant.

I charge you that the presumption of innocence is so strong that every reasonable doubt must be resolved in favor of the accused if there is any fact or circumstance that is susceptible to two interpretations.

I charge you that it matters not how serious an offense is. If the party upon trial is not guilty, then it is your duty to acquit him of that charge.

(Resp't Ex. 28, p.2217-19).

Petitioner maintains that the "[t]rial court's charge on the burden of proof beyond a reasonable doubt was improper and unconstitutional, permitting the jury to convict Petitioner upon less than 'utmost certainty' of guilt." (Pet'r Br. on the Merits of Claims for Relief, p. 66) Specifically, Petitioner states that the following language from the charge was unconstitutional: "'the State is not required to prove the guilt of the accused beyond all doubt or to a mathematical certainty. Moral and reasonable certainty is all that can be expected in a legal investigation'." (Pet'r Br. on the Merits of Claims for Relief, p. 66)(quoting Resp't Ex. 28, p. 2217). The Georgia Supreme Court already ruled against Petitioner on this issue and held that "[t]he trial court's instructions on 'reasonable doubt' were not erroneous." *Lynd*, 272 Ga. at 65.

As this claim was decided on the merits at the state court level, Petitioner can obtain relief only if he satisfies the requirements of 28 U.S.C. § 2254 (d).  Petitioner seems to maintain that the Georgia Supreme Court's decision on this issue is contrary to *Cage v. Louisiana*, 498 U.S. 39 (1990).  However, the standard of review announced in *Cage* was overruled by the Supreme Court of the United States in *Estelle v. McGuire*, 502 U.S. 62 (1991); which was decided almost three months prior to the Georgia Supreme Court's direct appellate review in this case.

In *Estelle*, the Court held that it disapproved of the standard of review language in *Cage* which provided that "'[i]n construing the instruction, we consider how reasonable jurors could have understood the charge as a whole'."  *Estelle*, 502 U.S. at 73 n.4 (quoting *Cage*, 498 U.S. at 41).  The Court explained that the correct standard of review regarding jury instructions is as follows:

> The only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.". . . .  "'It must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some [constitutional] right'." . . . . It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. . . .  In addition, in reviewing an ambiguous instruction such as the one at issue here, we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution. . . .

*Estelle*, 502 U.S. at 72 (citations omitted).

Petitioner does not argue, and has not in any way shown, that the Georgia Supreme Court's opinion in this case is contrary to, or an unreasonable application of, *Estelle*.  Petitioner has in no way shown that the trial court's instruction on the burden of proof "'so infected the

entire trial that the resulting conviction violated due process'." *Estelle*, 502 U.S. at 72 (citations omitted). Nor has Petitioner made any showing that there is a "'reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution. *Id.*

Additionally, to the extent that *Cage* remains good law following the Supreme Court's decision in *Estelle*, Petitioner has not shown that the Georgia Supreme Court's ruling was contrary to, or an unreasonable application, of *Cage*. In *Cage*, the Court held as follows:

> The charge did at one point instruct that to convict, guilt must be found beyond a reasonable doubt; but it then equated a reasonable doubt with a "grave uncertainty" and an "actual substantial doubt," and stated that what was required was a "moral certainty" that the defendant was guilty. It is plain to us that the words "substantial" and "grave," as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable-doubt standard. When those statements are then considered with the reference to "moral certainty," rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause.

*Cage*, 498 U.S. at 41.

In this case, the trial court did not equate reasonable doubt with "grave uncertainty" or an "actual substantial doubt." In fact, the court never used either of those phrases at all. Thus, unlike the situation in *Cage*, there was no language in the instruction to "suggest a higher degree of doubt than is required for acquittal under the reasonable-doubt standard." *Id*. The trial court did use the phrase "moral and reasonable certainty." However, this phrase was not used in conjunction with words such as "grave uncertainty" and "actual substantial doubt." According to the Court in *Cage*, it is only when words such as "grave uncertainty" and "actual substantial

doubt" "are . . . considered with reference to 'moral certainty'" that "a reasonable juror could have interpreted the instruction to allow finding of guilt based on a degree of proof below that required by the Due Process Clause." *Id*. No such situation existed in this case as these words ("grave uncertainty," "actual substantial doubt" and "moral certainty") were not used in conjunction with each other.[15]

Based on the above, the Court denies relief on this claim because Petitioner has failed to show that the Georgia Supreme Court's decision is contrary to, or an unreasonable application of, existing Supreme Court precedent. Neither has Petitioner maintained or shown that the state court decision is based on an unreasonable determination of the facts in light of the evidence.

b.  Petitioner's claim that his rights to due process, a fair trial, and a fair and reliable capital sentencing proceeding were violated by the trial court's improper sequential charge on murder and voluntary manslaughter

Petitioner claims that the trial court improperly charged the jury with a sequential voluntary manslaughter instruction in violation of *Edge v. State*, 261 Ga. 865 (1992). Respondent claims, and the Court agrees, that Petitioner has procedurally defaulted this claim.

Petitioner raised this claim, albeit obliquely, in his First Amended Petition for Writ of Habeas Corpus filed in the Butts County Superior Court. (Resp't Ex. 52). Petitioner stated

---

[15]The Court notes that the Supreme Court of the United States has since held that the use of the phrase "moral certainty" does not necessarily render a jury instruction unconstitutional. *Victor v. Nebraska*, 511 U.S. 1, 15-17 (1994); *see also Felker v. Turpin*, 83 F.3d. 1303 (11th Cir. 1996)(jury charge upheld despite use reference to "moral certainty."); *Harvell v. Nagle*, 58 F.3d 1541 (11th Cir. 1995).

generally that "[t]he trial court's instructions to the jury in the guilt/innocence phase of Petitioner's trial violated Petitioner's rights." (Resp't Ex. 52, p. 22). Although Petitioner never specifically stated that the sequential voluntary manslaughter charge is one of his alleged improper charges, he did cite *Edge*. (Resp't Ex. 52, p. 23). Moreover, Petitioner set forth his argument regarding the trial court's improper sequential charge on murder and voluntary manslaughter in detail in his post-hearing brief the he filed in the state habeas court. (Resp't Ex. 56, p. 79). In response, the state habeas court ruled as follows:

> The remainder of this enumeration is procedurally barred under <u>Black v. Hardin</u>, 255 Ga. 239 (1985), the Petitioner not having made the requisite showing of adequate cause for failure to object or pursue on appeal and a showing of actual prejudice to the Petitioner. This Court also finds no substantial denial of constitutional rights which would overcome the procedural bar.

(Resp't Ex. 59, p. 28).

As the Eleventh Circuit has explained, district courts may not review a claim "if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar, and the bar presents an independent and adequate state ground for denying relief." *Hill v. Jones*, 81 F.3d 1015, 1022 (11th Cir. 1996). In this case, the last state court to review this claim clearly and expressly stated that the claim was procedurally defaulted. Moreover, this "bar presents an independent and adequate state ground for denying relief." *Id*.

Petitioner seems to maintain that this Court should not defer to the state habeas court's finding of procedural default because this finding is erroneous. According to Petitioner, this issue was "clearly preserved and presented for the [Georgia Supreme] Court's consideration,"

and that court simply failed to rule on the claim.  (Pet'r Br. on the Merits of Claims for Relief, p. 74).

A review of the record shows that on July 3, 1991, Petitioner's appellate attorneys submitted an appellate brief that contained seven enumerations of errors to the Supreme Court of Georgia.  (Resp't Ex. 34.)  Petitioner's claim that the trial court gave an improper sequential charge on murder and voluntary manslaughter was not contained in this document.

Subsequently, Petitioner mailed a *pro se* letter dated September 5, 1991 to the "Supreme Court of Georgia, The Honorable Chief Justice Harold G. Clark," in which Petitioner set forth twenty-five additional claims and requested new appellate attorneys. (Resp't Ex. 37).  Petitioner raised the broad assertion in this letter that the "[c]ourt erred concerning instrutions (sic) to jury of lesser offines (sic)."  (Resp't Ex. 37).  In a letter dated September 12, 1991, the Clerk of the Georgia Supreme Court notified Petitioner that "[y]our comments and request concerning your attorneys should be addressed to the trial court which appointed them not to this Court.  Since you letter discusses issues you wish raised in your appeal, it is being filed as a brief in your case." (Resp't Ex. 38).

Petitioner's appeal was then argued orally before the Georgia Supreme Court.  (Resp't Ex. 43, p. 4).  More than two months after oral arguments, another of Petitioner's attorneys, Clyde Wayne Royals, submitted a Supplemental Brief of the Appellant.  (Resp't Ex. 39).  In this brief, attorney Royals set forth eight additional enumerations of errors; which he numbered eight

through fifteen.  (Resp't Ex. 39).  Attorney Royals included a number of claims that were contained in Petitioner's September 5, 1991 *pro se* letter.  However, he did not include Petitioner's claim regarding an improper sequential jury charge on voluntary manslaughter. (Resp't Ex. 39).

In its Opinion, the Supreme Court of Georgia ruled on the seven enumerations of error contained in Petitioner's original enumeration of errors filed by his attorneys on July 3, 1991. The court also held that it would rule on the additional eight enumerations of error contained in attorney Royal's Supplemental Brief of Appellant.  The Georgia Supreme Court did not rule on the issues contained only in Petitioner's *pro se* letter–which is the only place where Petitioner's claim that the trial court gave an improper sequential charge on voluntary manslaughter appears. *Lynd v. State*, 262 Ga. 58 (1992).

There was no requirement that the Supreme Court of Georgia rule on the claims contained only in Petitioner's *pro se* letter.   In *Eagle v. State*, 264 Ga. 1 (1994), the Georgia Supreme Court, citing *McKaskle v. Wiggins*, 465 U.S. 168 (1984), held as follows:

> In addition to the brief submitted by Eagle's appellate counsel, Eagle filed a *pro se* brief raising several additional claims.  Since Eagle is represented by appellate counsel, the additional claims raised in Eagle's *pro se* brief will not be considered. Neither our State Constitution nor the federal Constitution provide a defendant with a right to simultaneous representation by counsel and self-representation.

*Eagle*, 264 Ga. at 3.  *See also Coursey v. State*, 196 Ga. App. 135, 137 (1990)(holding that "[n]either the State Constitution . . . nor the Federal Constitution provides defendant with a right to simultaneous representation by counsel and self-representation . . . . Thus, we do not consider

those errors raised or arguments made by defendant himself."); *Simmons v. State*, 186 Ga. App. 886 (1988). As there was no requirement for the Georgia Supreme Court to consider the *pro se* letter sent by Petitioner, it was not error for the state habeas court to hold that Petitioner procedurally defaulted these claims, which he did not properly present to the Georgia Supreme Court during appeal. Therefore, this Court defers to the state habeas court's finding of procedural default as to this claim. *See Baily v. Nagle*, 172 F.3d 1299, 1302 (11th Cir. 1999)(holding that when "the state court correctly applies a procedural default principle of state law to arrive at the conclusion that the petitioner's federal claims are barred, *Sykes* requires the federal court to respect the state court's decision.")(citing *Wainwright v. Sykes*, 433 U.S. 72 (1977).

Petitioner has not shown cause to excuse the procedural default and actual prejudice resulting from the bar. *See Putman v. Turpin*, 53 F. Supp. 2d 1285, 1292 (M.D. Ga. 1999), *aff'd*, 268 F.3d 223 (11th Cir. 2001). Petitioner asserts that "the deficient performance of counsel accounts for [Petitioner's] failure to professionally articulate this claim." (Pet'r Br. on the Merits of Claims for Relief, p. 75). In *Murray v. Carrier*, 477 U.S. 478 (1986), the Supreme Court explained that "cause for a procedural default on appeal ordinarily requires a showing of some external impediment preventing counsel from constructing or raising the claim." *Id.* at 492. Beyond the bald assertion of "deficient performance of counsel," Petitioner has pointed to no "external impediment" that prevented this claim from being raised. (Pet'r Br. on the Merits of Claims for Relief, p. 75).

Because the Court finds that Petitioner has failed to establish cause to excuse the

procedural default of these claims, the Court need not analyze whether prejudice resulted as a result of the procedural default.  *See Putman*, 53 F. Supp. 2d at 1292.  The Court does note that Petitioner has not shown how the alleged improper sequential jury charge "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.*  Such a showing must be made to establish the prejudice necessary to overcome a procedural default.[16]

Additionally, Petitioner also has not alleged, or shown, that the Court's failure to consider these procedurally defaulted claims "would result in a fundamental miscarriage of justice."  *Id.* As Petitioner has failed to show that any of the exceptions to the procedural default rule apply, this Court defers to the state habeas court's ruling that Petitioner's claim regarding the improper sequential jury charge on murder and voluntary manslaughter has been procedurally defaulted.

c.  Petitioner's claim that the trial court improperly restricted the jury's consideration of the violent reputation of the victim in both phases of the trial

It appears that Petitioner first raised this claim at the state habeas corpus level.  The state habeas corpus court ruled that the claim was "procedurally barred under Black v. Hardin, 255 Ga. 239 (1985).  (Resp't Ex. 59, p. 16-17).  Moreover, the state court ruled that the Petitioner had not "made the requisite showing of adequate cause for failure to object or pursue on appeal *and* a showing of actual prejudice to the Petitioner."  Finally, the court found "no substantial

_____

[16]Petitioner was found guilty of malice murder.  (Resp't Ex. 28, p. 2254).  It appears that the Georgia courts have "repeatedly held that a violation of *Edge* is harmless when the jury convicts the defendant of malice murder."  *Anderson v. State*, 274 Ga. 871, 873 (2002).  As any *Edge* error in this case would be harmless, Petitioner certainly could not show prejudice from such error.

denial of constitutional rights which would overcome the procedural bar." (Resp't Ex. 59, p. 16-17, 23).

Because the last state court to review the claim stated "clearly and expressly that its judgment rests on a procedural bar, and the bar presents an independent and adequate state ground for denying relief," this court may not review the claim unless Petitioner can show that one of the two exceptions (cause excusing the default and actual prejudice resulting from the bar or a fundamental miscarriage of justice) to the procedural default rule apply. *Hill*, 81 F.3d at 1022-23.

Petitioner has not alleged or made any showing that either of these exceptions are applicable in this case. Given this, the Court defers to the finding of the state habeas corpus court and determines that this claim has been procedurally defaulted.

**5.   Claim Twelve: The State withheld material exculpatory evidence and presented false and misleading testimony in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the analogous provisions of the Georgia Constitution.**

Petitioner claims that "[t]he State suppressed information favorable to the defense at both phases of the trial, and the cumulative materiality of the suppressed evidence undermines confidence in the outcome of the guilt/innocence and penalty phases of Petitioners trial, and Petitioner's direct appeal." (Pet'r Br. on the Merits of Claims for Relief, p. 80). Moreover, Petitioner alleges that the "State knowingly or negligently presented false testimony in pretrial and trial proceedings" in the form of the medical examiner, Warren Tillman's, testimony. It

appears that Petitioner first made these arguments at the state habeas corpus level and that court held as follows:

> This enumeration is procedurally barred under <u>Black v. Hardin</u>, 255 Ga. 239 (1985), the Petitioner not having made the requisite showing of adequate cause for failure to object or pursue on appeal *and* a showing of actual prejudice to the Petitioner.  This Court also finds no substantial denial of constitutional rights which would overcome the procedural bar.

(Resp't Ex. 59, p. 15).

Given the clear and express declaration of a procedural bar, this Court can consider the claim only if Petitioner shows both cause excusing the default and prejudice arising from the bar or a fundamental miscarriage of justice.  *Hill*, 81 F.3d at1022-23.  Petitioner has failed to establish that either of the exceptions to the procedural default rule apply.  First, Petitioner has failed to show cause to excuse the default as he has not alleged, nor made any showing, that any factors external to the defense prevented the presentation of this claim on direct appeal.  *See Murray v. Carrier*, 477 U.S. 478 (1986); *Putman v. Turpin*, 53 F. Supp. 2d 1285 (M.D. Ga. 1999), *aff'd*, 268 F.3d 223 (11th Cir. 2001).

As Petitioner has not shown cause for the default, the Court need to determine if prejudice exists.  *Parker v. Head*, 244 F.3d 831 (11th Cir. 2001).  However, the Court notes that Petitioner has not shown how he was prejudiced by any suppressed evidence.  In fact, Petitioner has completely failed tell the Court what favorable evidence was allegedly undisclosed.  Petitioner has simply offered no evidence that the State suppressed any favorable evidence at all.  As Petitioner has not shown what, if anything, was suppressed, the Court certainly cannot

tell how, if at all, he was prejudiced by this alleged suppression.

Petitioner states that "[t]he State took advantage of Petitioner's ignorance of the undisclosed favorable information by arguing to the jury that which it knew or should have known to be false and/or misleading."  (Pet'r Br. on the Merits of Claims for Relief, p. 80). Again, however, Petitioner completely neglects to let this Court know to what "undisclosed favorable information" he is referring.  Petitioner complains that the case against him is based on the "patently false and misleading 'expert' testimony from medical examiner Warren Tillman . . . ; and, additionally, on an unreliable confession from [Petitioner]."  (Pet'r Br. on the Merits of Claims for Relief, p. 81-82).  However, Petitioner was well aware of the confession and the autopsy report of the medical examiner before trial.  The record shows that Petitioner's attorneys challenged his confession pre-trial and vigorously cross-examined Warren Tillman during trial. (Resp't Exs. 8, 9, 26).  Moreover, on cross-examination of Mr. Tillman, Petitioner established what he maintains now:  That it was entirely possible Ms. Moore never regained consciousness after the second shot, and, after that point, she never felt any pain.

Finally, the Court finds that Petitioner has not established the only other exception to the procedural default rule–that the failure of the court to consider the defaulted claim would result in a "fundamental miscarriage of justice."  *Putman*, 53 F. Supp.2d at 1292.  Given this, the Court defers to the state habeas court's finding that this claim has been procedurally defaulted.

## III.  CONCLUSION

Based on the above, the Court denies Petitioner's Petition for Writ of Habeas Corpus By

a Person in State Custody.

**SO ORDERED**, this 31st day of October, 2005.


**s/   Hugh Lawson**
HUGH LAWSON, JUDGE

lnb